**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARY S. SHOEMAKER, | CASE NO. 1:14-cv-02049-SHR-GBC |
| | |
| | (JUDGE RAMBO) |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| | REPORT AND RECOMMENDATION |
| CAROLYN W. COLVIN, | TO VACATE THE DECISION OF |
| COMMISSIONER OF | THE COMMISSIONER AND |
| SOCIAL SECURITY, | REMAND FOR FURTHER |
| | PROCEEDINGS |
| Defendant. | Docs. 1, 10, 11, 16, 17, 20 |

## REPORT AND RECOMMENDATION

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Mary S. Shoemaker ("Plaintiff") for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.*, §§416.901 *et. seq.*[1] (the "Regulations"). Plaintiff asserts disability as a result of, *inter alia*, mental retardation combined with a learning disability and gastrointestinal impairments. She was in special

---

[1] Part 404 governs disability insurance benefit applications and Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

education classes from first through twelfth grade, never worked, and never lived alone during or prior to the relevant period. Her family reports that she is under constant supervision and cannot add, subtract, or count change. She lives with her parents, performs few household chores, and does not leave the house alone.

Plaintiff asserts that the ALJ lacked substantial evidence to find she did not meet the requirements of 20 C.F.R. Part 404, Subpart P, Appendix, §12.05(C) ("Listing 12.05(C)"). A claimant establishes disability pursuant to Listing 12.05(C) by demonstrating an intellectual disability with an IQ score between 60 and 70 and an "additional and significant work-related limitation of function." *Id.* In *Markle v. Barnhart*, 324 F.3d 182 (3d Cir. 2003), the Third Circuit held that "additional and significant work-related limitation of function" should be construed to mean only an additional severe impairment. *Id.* 187-88. The ALJ found that Plaintiff had an IQ of 69 and an additional severe impairment of learning disability. Although the ALJ found that Plaintiff's learning disability was severe, the ALJ also found that Plaintiff's learning disability did not constitute an "additional and significant work-related limitation of function." The ALJ erred as a matter of law by inconsistently concluding that Plaintiff suffered an additional severe impairment, but did not suffer an additional and significant work-related limitation of function.

Plaintiff also underwent three surgeries during or prior to the relevant period for superior mesenteric artery syndrome ("SMA"). SMA occurs when part of the

small intestine is fully or partially blocked because it is compressed between two arteries.  Plaintiff asserts that her SMA caused pain, weight loss, lowered blood pressure, and dizziness upon standing. The ALJ lacked substantial evidence to find that Plaintiff's SMA was non-severe and did not constitute an "additional and significant work-related limitation of function." First, the ALJ does not acknowledge Plaintiff's SMA diagnosis, and mentions only one of her three surgeries for SMA complications. The ALJ also improperly concludes that her surgeon considered her "abdominal difficulties" to be resolved, when his records show that he opined Plaintiff would continue to be symptomatic and may need further surgery. Thus, the ALJ lacked substantial evidence and failed to provide sufficient explanation to conclude that her SMA was not severe or an "additional and significant work-related limitation of function" pursuant to Listing 12.05(C).

Plaintiff's symptoms were corroborated by her aunt and mother. The ALJ did not identify the weight assigned to the mother's reports and rejected her aunt's testimony solely based on a conclusory finding that she had an "interest" in the outcome. This is not a proper reason, alone, to reject a third-party witness's claims. The ALJ's failure to provide sufficient explanation for rejecting these claims precludes meaningful judicial review.

For the forgoing reasons, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.    Procedural Background

On January 11, 2011, a previously filed application for benefits under the Act was denied by an ALJ. (Tr. 76-98). On May 19, 2011, Plaintiff filed an application for SSI under the Act. (Tr. 129-37). On July 29, 2011, the Bureau of Disability Determination denied Plaintiff's application (Tr. 99-108), and Plaintiff filed a request for a hearing on September 26, 2011. (Tr. 109). On January 9, 2013, an ALJ held a hearing at which Plaintiff's aunt, Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 35-68). On March 25, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 18-34). On May 1, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 15-17), which the Appeals Council denied on August 20, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On October 24, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On December 22, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On April 10, 2015, Plaintiff filed a brief in

support of her appeal ("Pl. Brief"). (Doc. 16). On May 7, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 17). On May 26, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 20). On June 29, 2015, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.	Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV.	Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also

determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

### V. Relevant Facts in the Record

#### A.      Age, Education, Vocational History

Plaintiff was born on June 23, 1991 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 29). Plaintiff has at least a high school education and no past relevant work. (Tr. 29). The relevant period begins on January 12, 2011, the day after the previous ALJ denial. (Tr. 23).

#### B.      Prior ALJ decision

On January 11, 2011, a prior ALJ issued a decision denying Plaintiff benefits under the Act. (Tr. 79-94). The prior ALJ found that Plaintiff's learning disorder, depression, and SMA were medically determinable and severe. (Tr. 84). The ALJ did not evaluate Listing 12.05(C) because the ALJ found that Plaintiff had an IQ greater than 70. (Tr. 91). The prior application folder contains a consultative psychiatric examination and two opinions from Plaintiff's teachers. (Tr. 86). The present ALJ did not acknowledge these records. (Tr. 30-37). The prior ALJ noted that Plaintiff's teacher indicated she was "in learning support classes 100% of the time in l2th grade. The claimant's teacher found her to have 'a serious problem' to a 'very serious problem' in all areas of acquiring and using

information." (Tr. 86). The prior ALJ noted that her teacher "stated that the claimant is below grade level in all academics and needs repetition and review to have success. The evidence further reflects that the claimant had a teacher's aide who assisted her daily with reading and filling in worksheets." (Tr. 86).

## C.   Function Report and Testimony

On April 26, 2011, Plaintiff completed a function report with the assistance of her mother. (Tr. 182). She indicated that she took Prozac for depression, which caused side effects of diarrhea. (Tr. 182). She indicated that her SMA caused pain every time she ate, with nausea, vomiting, gas, and burning/pinching/stabbing pain. (Tr. 184). She indicated that the pain lasted for about an hour. (Tr. 184). She explained she had lost weight as a result of SMA. (Tr. 185). She indicated that she had limitations in lifting and walking because of her SMA pain, and could only walk for two blocks. (Tr. 180). She indicated that she could not hold her son for more than three minutes because of her stomach pains. (Tr. 179). She indicated that she got "sick" if she was on her feet for more than five minutes. (Tr. 177). She explained that she could only cook microwaveable meals for less than ten minutes because she could not "stand long." (Tr. 177).

On May 20, 2011, Plaintiff's mother authored a function report. (Tr. 189). She identified problems with talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 194). She

reported that she spends all day with Plaintiff, watching her and taking her to appointments. (Tr. 189). She indicated that she reminded Plaintiff to take medication and cooked meals for her, and that Plaintiff's father helps her with her son. (Tr. 190). She reported that Plaintiff does not go anywhere by herself. (Tr. 190). She indicated that Plaintiff needed help choosing what clothes to wear, needs reminders to bathe and care for her hair, and does not know how to shave. (Tr. 190). She noted that Plaintiff could not handle money, add, or subtract. (Tr. 190). She indicated that Plaintiff could spend three to five minutes preparing frozen, microwave meals but needed help reading the directions. (Tr. 191). She indicated that Plaintiff could only walk for five minutes. (Tr. 194). She reported that Plaintiff performed a "little bit of dusting" every other day for two hours, but only when told. (Tr. 191). She indicated that Plaintiff could not walk, drive a car, or use transportation to get around, and is unable to go out alone. (Tr. 192). She reported that Plaintiff could not shop in stores without help. (Tr. 192). She reported that Plaintiff does not spend time with others and needed reminders to go to doctor's appointments. (Tr. 193). She indicated that Plaintiff does not get along well with others because she thinks people are yelling at her. (Tr. 194).

On January 9, 2013, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 39). She testified that she could read and write, but not add or subtract. (Tr. 41, 50). She testified that she could not handle money and would not be able to

handle disability benefits on her own. (Tr. 51). She testified that she had been in special education since the first grade, and there her teachers wanted her to go to school until she was twenty-one years old. (Tr. 53). She explained that she graduated high school with special accommodations. (Tr. 44). She testified that she had never lived on her own, living either with her parents or her son's father. (Tr. 51). She indicated that she shared custody of her son with her aunt. (Tr. 41, 44). She indicated that her father had to help her bathe her son because she would get frustrated. (Tr. 55). She testified that she could not take transportation because she would get on the wrong bus or get lost. (Tr. 56). She testified that she had problems dropping her son off at his early intervention program because "I could not work the intercom. I didn't know if I was supposed to press it or hold it in and when I was trying both ways the lady got aggravated with me." (Tr. 56). She testified that she had never had a driver's license. (Tr. 41). She testified that she was able to handle her personal care, but could not cook and could not do the laundry. (Tr. 43, 53). She testified that she did not have any hobbies, read, or go shopping on her own. (Tr. 44, 52). She testified that she attempted to work at a local restaurant and bar, but was unable to complete her first day. (Tr. 49).

She testified that she had daily stomach aches that required her to lay in the fetal position, so she needed help caring for her son. (Tr. 51). She explained that the stomach aches occurred after eating. (Tr. 57). She testified that she may need

further surgery if bile continued to go into her stomach. (Tr. 43). She testified that she was unable to stand or walk for more than five minutes because it caused a blood pressure drop that led to dizziness. (Tr. 46).

Plaintiff's aunt, Benita Mahle, also appeared and testified. (Tr. 63). She testified that she had been around Plaintiff all of her life, and that she saw Plaintiff three to four times per week. (Tr. 63). She testified that she observed that, as a child, Plaintiff "couldn't comprehend." (Tr. 63). She explained that Plaintiff "had a problem with probably every subject in school. The school did want to keep her until she was 21 years old." (Tr. 64). When asked if Plaintiff "would be capable of living on her own," Ms. Mahle responded, "[n]o," and explained:

> She makes poor choices. She doesn't know how to manage money. She's afraid -- she's actually afraid to go out and meet new people, to be around other people. She's always in the house and the only time she leaves it's either with her mother, her father or me. And I really don't-- she has to be under adult supervision at all times, I believe.

(Tr. 64).

### D. Medical Evidence

In 1997, when Plaintiff was in first grade, she underwent testing that showed a verbal IQ of 69, a performance IQ of 79, and a full scale IQ of 71. (Tr. 232).

Plaintiff treated for depression, anxiety, adjustment disorder, borderline intellectual functioning, and bipolar disorder at Northeastern Counseling from October of 2009 to October of 2011. (Tr. 355-71). She reported low self-esteem

and that her "main goal" was to "get a job and be able to work with others without getting upset and crying." (Tr. 368). She explained that she had "tried to work but feels that her emotional issues get in the way and she does feel that she has not been adequately educated." (Tr. 365). She reported tearfulness, social withdrawal, helplessness, guilt, shakiness, and oppositional behavior. (Tr. 368). She reported strained relationships with her family and her boyfriend. (Tr. 365, 371).  Providers later described her boyfriend as verbally abusive. (Tr. 363). She was "very articulate despite indicating her difficulties with her educational issues." (Tr. 366). Her responses "indicate[d] no difficulties intellectually with orientation or memory." (Tr. 366). Throughout treatment she had a GAF of 50-55. (Tr. 351-53, 357-58, 360, 366). She exhibited depressed mood, blunted affect, and impaired insight, judgment, and impulse control. (Tr. 353, 355-56, 358-59, 363, 394). Once she gave birth to her son, she was treated with Celexa, then an escalating dose of Prozac. (Tr. 311, 349, 352, 357, 394). On April 19, 2012, Northeast Counseling Services responded to a medical records request indicating that records existed only through October of 2011. (Tr. 392).

Plaintiff was diagnosed prior to the relevant period with SMA. (Tr. 291). SMA is "[a] condition resulting from the compression of the duodenum (first part of small intestine) against the aorta (large artery) by the superior mesenteric artery [that] results in partial or complete obstruction of the duodenum (and appears most

commonly after a rapid loss of weight). The symptoms include abdominal distention, pain, nausea, and vomiting." 5-S Attorneys' Dictionary of Medicine S-114071 (Bender 2015). SMA pain is "usually relieved by assuming a knee-chest position or when lying prone." Bermas, Honnie, and Michael E. Fenoglio. "Laparoscopic management of superior mesenteric artery syndrome." *JSLS, Journal of the Society of Laparoendoscopic Surgeons* 7.2 (2003): 151-153, 151. She treated with Dr. Clark Gerhart, M.D. (Tr. 266). She had "classic symptoms of nausea, vomiting, shortly after eating and weight loss." (Tr. 291). Her weight went from 160 pounds in November of 2007 to 126 pounds in March of 2009. (Tr. 159).

In January of 2009, she underwent a gastrojejunostomy. (Tr. 238). She was off from school for at least one week. (Tr. 238). She was released to full activity and diet on February 19, 2009, except for a prohibition from participating in gym class. (Tr. 54, 272). In May of 2010, Plaintiff returned to Dr. Gerhart with a recurrence of symptoms. (Tr. 266). She explained that, after her surgery, she "had undergone a pregnancy and during that period she felt pretty good." (Tr. 271). She reported pain in the epigastrium and exhibited mild discomfort to deep palpation. (Tr. 271). She indicated losing ten pounds or more recently. (Tr. 276). Imaging showed "moderately severe gastritis." (Tr. 275). In July of 2010, Dr. Gerhart concluded that Plaintiff's "symptoms of abdominal pain after eating" were "characteristic of her previous SMA syndrome pain." (Tr. 274). He recommended

a duodenojejunostomy. (Tr. 274). Plaintiff was also diagnosed with gastritis. (Tr. 274). She was treated first with Protonix, then Carafate. (Tr. 274). She was unable to tolerate Protonix and Carafate did not "improv[e] her symptoms." (Tr. 274).

On August 19, 2010, Plaintiff underwent a jejunoduodenostomy. (Tr. 279, 303). The operative report notes that the "previous gastrojejunostomy was created but had grown shut." (Tr. 279). Blood pressure was 93/59. (Tr. 303). At a follow-up on August 30, 2010, Plaintiff was tolerating soft food with "no postoperative problems." (Tr. 273).

In April of 2011, Plaintiff filed another application for benefits under the Act. *Supra*. On April 28, 2011, Plaintiff followed-up with Dr. Gerhart. (Tr. 435). She reported feeling "a mass in her right lower quadrant abdominal wall that is firm and mobile." (Tr. 435). Dr. Gerhart noted that "[r]ecent EGD [Tr. 266] showed gastritis and patent gastrojejunostomy as well as duodenojejunostomy. Pinch biopsies showed gastritis with no H. pylori. Upper GI showed a patent gastrojejunostomy. Ultrasound and nuclear biliary scan of the gallbladder are normal. Right lower quadrant abdominal wall mass superficial, firm 1 ½ cm just to the right and below the umbilicus, likely a lipoma." (Tr. 435). Dr. Gerhart assessed Plaintiff to have abdominal pain "likely due to gastritis" and an abdominal wall lipoma. (Tr. 435). Dr. Gerhart prescribed Prevacid for gastritis and recommended

outpatient surgical excision of the lipoma. (Tr. 435). Plaintiff underwent the excision on May 4, 2011. (Tr. 427-29).

On May 16, 2011, Plaintiff followed-up with Dr. Gerhart. (Tr. 434). She was "doing well with no complaints" with regard to the excision of her abdominal wall mass. (Tr. 434). However, she was "trying to get the Prevacid which does help her abdominal discomfort but her insurance is requiring additional paper work to cover it." (Tr. 434). Dr. Gerhart explained that Plaintiff "need[ed] to be on the Prevacid since she seems to have some mild gastritis or marginal ulceration from her gastrojejunostomy or jejunoduodenostomy." (Tr. 434).

On September 12, 2011, Plaintiff presented to Dr. Dipinpreet Kaur, M.D., of Wyoming Valley Family Medicine with complaints of back pain. (Tr. 411). She explained she had been bent over for a prolonged period of time while cleaning. (Tr. 411). Her problem list included "[d]izziness and giddiness (780.4)." (Tr. 411). Physical and mental examinations were normal and Plaintiff was instructed to treat her pain with heat, cold, and ibuprofen. (Tr. 412).

In December of 2011, Plaintiff presented to Dr. Mythri Gollapalle, M.D. at Wyoming Valley Family Medicine for hemorrhoids. (Tr. 408). Plaintiff was prescribed a topical foam and instructed to follow-up. (Tr. 410). Her problems included "dizziness and giddiness" with a diagnostic code of 780.4. (Tr. 408). Her blood pressure was 100/60. (Tr. 409).

On February 6, 2012, Plaintiff followed-up with Dr. Richard English, M.D., at Wyoming Valley Family Medicine. (Tr. 405). Plaintiff reported that her medication was not working for Achilles tendonitis, and "sporadically" experienced her right ankle locking. (Tr. 405). She reported chest pain that she first experienced while watching her parents argue and losing her temper quickly. (Tr. 405). Examination indicated "[d]iffuse abdominal tenderness without rebound or guarding." (Tr. 407). Dr. English prescribed Wellbutrin, explaining that "while [Plaintiff] does not seem to have overt signs of depression, she may benefit from antidepressant due to high stress environment and anxiety component as well as smoking cessation effects." (Tr. 407). Plaintiff reported that "she used to see a counselor but does not want to start again." (Tr. 405). Blood pressure was 118/62.

On February 20, 2012, Plaintiff followed-up with Dr. English. (Tr. 402). She had been unable to take Wellbutrin because she could not swallow the pills. (Tr. 402). She reported three episodes of chest pain since her last visit, and a headache since a car accident the day before. (Tr. 402). Physical and mental examinations were normal except for echymosis and tenderness to palpation in the knee. (Tr. 404). She was assessed to have a knee contusion and anxiety. (Tr. 404).

On May 25, 2012, Plaintiff followed-up with Dr. English. (Tr. 399). She had left her partner after he abused her and her son. (Tr. 399). She reported continued muscle spasms in her chest that felt like menstrual cramps, although she had "no

stress in [her] life." (Tr. 399). She reported problems sleeping and low blood pressure, with dizziness, shakiness, and other symptoms. (Tr. 399). Providers discussed a "referral to Lackawanna women's protective services." (Tr. 401). Physical and mental examinations were normal. (Tr. 401). Plaintiff was assessed to have tobacco abuse, unspecified abdominal pain, and unspecified chest pain. (Tr. 401).

On June 27, 2012, Plaintiff presented to Laura Temprine, PA, at Wyoming Valley Family Medicine for a sick visit. (Tr. 396). She reported feeling dizzy that morning and suspected her blood pressure had dropped. (Tr. 396). She explained that eating a hot dog did not resolve the dizziness, but drinking a soda did relieve the dizziness.[2] (Tr. 396). She had no current symptoms. (Tr. 396). She was scheduled for blood work. (Tr. 396). Blood pressure was 102/60. (Tr. 397).

On August 2, 2012, Plaintiff returned to Dr. Gerhart. (Tr. 433). She explained that she had "recurrent epigastric pain" that was "worse with eating." (Tr. 433). She was losing weight and unable to eat food, although she could keep liquids down. (Tr. 433). She reported "low blood pressure problems and [was] unable to stand or walk more than 10 or 15 minutes without getting dizzy," with

---

[2] "Restricted oral intake can cause low blood pressure" which can lead to "[s]ymptoms of dizziness" that are "treated with fluid repletion." Pomeroy, Claire, and James E. Mitchell. "Medical complications of anorexia nervosa and bulimia nervosa." *Eating disorders and obesity: A comprehensive handbook* 2 (2002): 278-85, 279.

daily diarrhea. (Tr. 433). Dr. Gerhart noted that Plaintiff was having "similar symptoms to what she's had in the past and this may be continued SMA syndrome problems. She has healed off a bypass in the past and this was recreated. She also had gastritis and was treated for this." (Tr. 433). Dr. Gerhart scheduled Plaintiff for an additional studies. (Tr. 416-18, 422-25, 433).

On August 30, 2012, Plaintiff followed-up with Dr. Gerhart, who noted:

> Pathology shows chemical gastropathy, consistent with bile gastritis... EGD showed severe gastritis and bile coming from the gastrojejunostomy in the anterior stomach. The jejunoduodenostomy was patent.

(Tr. 432). Dr. Gerhart assessed Plaintiff to have bile gastritis, and explained that it appeared "the gastrojejunostomy has reopened allowing the bile to reflux into the stomach, causing bile gastritis. Her symptoms are quite disruptive to her daily lifestyle, so I recommended repair." (Tr. 432). Dr. Gerhart noted there were two surgical options:

> We discussed taking down the gastrojejunostomy, which will prevent bile reflux from the jejunum. This will unfortunately still allow bile to reflux back through the pylorus. To correct the pyloric reflux, this would require a much more extensive operation, which would include dividing the pylorus and creating a Roux-en-Y gastrojejunostomy. The patient would like to do the least aggressive procedure as possible to limit her hospital stay, due to the need to take care of her young son and also to avoid an expensive hospital bill. She consented to the robotic takedown of gastrojejunostomy, understanding there may still be some bile reflux through the pylorus that may require an additional operation.

(Tr. 432). Plaintiff underwent the surgery on September 19, 2012. (Tr. 419-20).

On October 4, 2012, Plaintiff followed-up with Dr. Gerhart. (Tr. 431). She was "eating better, but not normal yet," and had eaten "a whole plate of food" on one occasion. (Tr. 431). Dr. Gerhart instructed Plaintiff to continue focusing on soft foods and to take "an H2 blocker or other acid medicine for her stomach, to help with the healing of the bile gastritis," but Plaintiff's insurance would not cover these medications. (Tr. 431).

### E. Opinion Evidence

On June 27, 2011, Plaintiff presented to state agency physician Dr. John Callahan, D.O., for a consultative examination. (Tr. 383). He opined that there was "no empirical evidence to support physical limitations." (Tr. 385). She reported "bouts of diarrhea and constipation." (Tr. 385). He limited her to only occasional lifting and carrying up to twenty pounds. (Tr. 386). On May 25, 2011, the state agency noted in Plaintiff's development summary that "Dr. Hite"[3] had completed a medical opinion. (Tr. 391). However, the record does not contain any medical opinion regarding Plaintiff's mental functioning from the relevant period. Doc. 11.

### F. ALJ Findings

---

[3] In cases before the undersigned, the state agency relied on medical opinions from Dr. Mark Hite, Ph.D. *See Duvall-Duncan v. Colvin*, 1:14-CV-17, 2015 WL 1201397, at *13 (M.D. Pa. Mar. 16, 2015); *Torres v. Colvin*, 3:12-CV-0998, 2014 WL 4187669, at *6 (M.D. Pa. Aug. 21, 2014); *Tucker v. Colvin*, 3:13-CV-02416-GBC, 2014 WL 4411059, at *12 (M.D. Pa. Sept. 8, 2014); *Treadway v. Colvin*, 3:14-CV-01697-GBC, 2015 WL 5934259, at *5 (M.D. Pa. Oct. 7, 2015).

On March 25, 2013, the ALJ issued the decision. (Tr. 31). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 4, 2011, the alleged onset date, and was insured through December 31, 2011. (Tr. 23). At step two, the ALJ found that Plaintiff's learning disability and mild mental retardation were medically determinable and severe.  (Tr.27). The ALJ found that Plaintiff's status post robotic take down of the gastrojejunostomy, status post endoscopy, dizziness, gastroesophageal reflux disease, depression, post partum depression, and adjustment disorder were medically determinable but non-severe. (Tr. 24). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 27). The ALJ found that Plaintiff had the RFC to perform:

> [A] full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to occupations that require no more than occasional climbing, balancing and stooping with no climbing of ladders. The claimant must avoid vibration and hazards. Lastly, the claimant is limited to simple, routine tasks in a low stress environment defined as only occasional decision making required and only occasional changes in the work setting.

(Tr. 26). At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 29). At step five, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 30).  Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 30).

## VI.    Plaintiff Allegations of Error

### A.    Listing 12.05(C)

Plaintiff asserts the ALJ lacked substantial evidence to find that she did not meet Listing 12.05(C). Listing 12.05(C) requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22" with "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Listing 12.00 explains that "[f]or paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." *Id.* These regulations explain that a "severe" impairment is one that "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§404.1520(c), 416.920(c). "If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met…. Reasonable doubts on severity are to be resolved in favor of the claimant." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 (3d Cir. 2003) (internal citations omitted).

In *Markle v. Barnhart*, 324 F.3d 182 (3d Cir. 2003), the Third Circuit wrote that:

> The ALJ found that "[t]he medical evidence establishes that the claimant has severe chronic obstructive pulmonary disease,

hypertension, obesity, gout, and diminished intelligence," and that these severe impairments restrict him to a limited range of light work. These findings establish the second criterion for entitlement under § 12.05C, a physical or other mental impairment imposing additional and significant work-related limitations of function.

Several courts of appeals have held that a finding of a severe impairment establishes the second prong of § 12.05C, e.g., *Luckey v. U.S. Dept. of HHS,* 890 F.2d 666, 669 (4th Cir.1989); *Fanning v. Bowen,* 827 F.2d 631, 633 (9th Cir.1987). In *Williams v. Sullivan,* 970 F.2d 1178, 1186–89 (3rd Cir.1992), we alluded to the requirement of "a physical or other mental impairment imposing additional and significant work-related limitation of functions", but it was unnecessary to frame a definition because we had decided that the claimant's evidence was insufficient to show that he was mentally retarded prior to age 22. However, more recently the Commissioner in new regulations on the evaluation of mental disorders addressed the second prong of § 12.05C, stating that "[w]e always have intended the phrase to mean that the other impairment is a "severe" impairment as defined in §§ 404.1520(c) and 416.920(c)." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746, 50772 (August 21, 2000).

*Id.* at 187-88. Thus, Plaintiff only needs to establish an additional severe impairment to meet Listing 12.05(C).

Defendant responds first the Plaintiff's learning disability was not a separate impairment. (Def. Brief at 10-11) (citing *Hartzog v. Barnhart*, , 100 (3d Cir. 2006); *Buckner v. Apfel*, 213 F.3d 1006, 1012 (8th Cir. 2000)). Neither of these cases are binding, and neither addresses an ALJ who finds an additional severe impairment. *Id.* Here, the ALJ found that Plaintiff had an additional severe impairment. (Tr. 23). Thus, *Markle,* not *Hartzog* or *Buckner,* applies to this case.

Defendant also responds by citing *Aucker v. Colvin*, 2014 WL 6066015, at *13 (M.D. Pa. Nov. 13, 2004), which held that moderate limitations in concentration, persistence, and pace did not, alone, suffice to meet Listing 12.05. However, in *Aucker*, the ALJ's Listing assessment was supported by a psychiatric medical opinion that specifically addressed Listing 12.05, the claimant did not have the requisite IQ score, and the claimant had performed work. *Id.* at 12-13. Here, the ALJ failed to obtain any medical opinion regarding Plaintiff's psychiatric functioning, the ALJ found that Plaintiff had the requisite IQ score, and Plaintiff has "performed no work during the fifteen years prior to [her] SSI application." (Tr. 23). Moreover, the *Aucker* Court did not address *Markle*'s definition of an additional, significant impairment. *Aucker v. Colvin*, 3:13-CV-02019, 2014 WL 6066015, at *12 (M.D. Pa. Nov. 13, 2014).

Defendant argues that this case is distinguishable from *Markle* because "her learning disability [does not cause] functional limitations distinct from her intellectual disability/mental retardation." (Def. Brief at 11). However, neither *Markle* nor the regulations promulgated by Defendant and cited in *Markle* include a requirement that the impairments cause "distinct" limitations, as opposed to distinct impairments. *Supra.* The Act and Regulations instruct adjudicators to consider limitations in combination. *See* 20 C.F.R. § 416.920(a)(ii). Adjudicators

do not undertake an impairment-limitation pairing for each limitation. *Id.* the ALJ here did not assign specific limitations to specific impairments. (Tr. 23-37).

The ALJ wrote that Plaintiff's learning disorder had "more than a de minimis effect on the [her] ability to perform basic work activities." (Tr. 23). The ALJ concluded that her learning disorder did not cause an additional significant impairment because "school records that the claimant received no more than part time learning and speech/language support while she was in school and graduated from high school." (Tr. 25). Thus, it appears that the ALJ improperly applied a more stringent standard to assess her learning disorder at step three. *Id.*

Plaintiff's graduation from high school does not render the ALJ's error harmless. Plaintiff testified at length regarding her special education. (Tr. 53-54). Plaintiff argues on appeal that "if a student is unable to meet a district's graduation requirements due to a disability, and requires special education services or modifications to the general curriculum, the student can graduate and receive a regular diploma if the student's IEP [Individualized Education Program] team determines that the student has completed his or her special education program." (Pl. Brief at 8) (citing http://thenotebook.org/spring-2008/08219/answers-about-graduation-students-disabilities (Last visited 4/9/15)). The ALJ does not address the lower graduation requirements for special education students. (Tr. 25-37). Defendant acknowledges that Plaintiff had learning support and special education,

but does not address the impact of special education on her graduation requirements. (Def. Brief).

The ALJ erred as a matter of law in finding that Plaintiff's learning disorder was severe, but not an additional significant impairment under Listing 12.05(C). *See Yurek v. Colvin*, No. 1:13-CV-1571, 2014 WL 4078592, at *11 (M.D. Pa. Aug. 18, 2014) ("It was an error of law for the ALJ" to find that claimant had a verbal IQ of 68, additional severe impairments, and include physical limitations in the RFC, yet find that the claimant did not meet Listing 12.05C) (citing *Ogin v. Comm'r of Soc. Sec.*, No. 3:13-CV-01365, 2014 WL 2940599, at *12 (M.D. Pa. June 30, 2014) ("[A]t step two of the sequential evaluation process, the ALJ concluded that Plaintiff suffered from the severe impairments of depression and anxiety…[and[ restricted [Plaintiff] to the performance of a range of light work eroded by several additional postural and non-exertional limitations…In sharp contrast, at step three the ALJ found that Plaintiff had no other impairment imposing an additional and significant work-related limitation of function. The ALJ failed to provide any explanation reconciling these inconsistent conclusions. Based on the standard set by the SSA, we conclude that the ALJ erred as a matter of law at step three by rejecting as impairments which impose additional and significant work-related limitations of function the same impairments he found to be severe at step two.")).

Plaintiff asserts that reversal, rather than remand, is the proper remedy in this case. (Pl. Brief at 7). Plaintiff has established that she had an additional significant impairment and onset before the age of twenty-two.[4] *Supra.* Defendant does not dispute that she meets the IQ requirement. (Def. Brief at 8-15).

However, the ALJ only briefly discussed Plaintiff's IQ score, writing that "[t]he claimant's 3 valid scores from November 4, 1997 reflect a verbal score of 69, however her performance score was 79 and full scale score was 71." (Tr. 25). Plaintiff's verbal score of 69 could suffice, as the Listing requires only a "valid verbal, performance, or full scale IQ of 60 through 70." *Id.* An ALJ is not required, however, to accept a claimant's IQ scores. *See Aucker v. Colvin*, 3:13-CV-02019, 2014 WL 6066015, at *12 (M.D. Pa. Nov. 13, 2014). Plaintiff's only qualifying IQ score was from 1997, when she was in first grade, fifteen years prior to the ALJ decision. In October of 2009, psychiatric examination indicated that she was "very articulate despite indicating her difficulties with her educational issues." (Tr. 366). Her responses "indicate[d] no difficulties intellectually with orientation or memory." (Tr. 366). Plaintiff's counsel argued that the IQs noted in her prior application were inaccurate. (Tr. 65). However, the ALJ, not the Court, should

---

[4] Defendant asserts that Plaintiff has waived her argument that her intellectual disability had an onset before age twenty-two. (Def. Brief at 15). The Court finds no merit to this argument. Plaintiff's qualifying IQ score was from before she turned 22, she applied for benefits before she turned 22, and the ALJ issued the decision before she turned 22. (Tr. 23-37).

evaluate this argument in the first instance. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted)). Consequently, the Court recommends remand, rather than reversal and award of benefits, for the ALJ to properly analyze Plaintiff's IQ.

### B.    Superior mesenteric artery syndrome

Plaintiff assets her SMA should have been found severe at step two, and that her SMA diagnosis boosts the credibility of her claimed symptoms. (Pl. Brief). SMA symptoms include abdominal distention, pain, nausea, and vomiting." 5-S Attorneys' Dictionary of Medicine S-114071 (Bender 2015). SMA pain is "usually relieved by assuming a knee-chest position or when lying prone." Bermas, Honnie, and Michael E. Fenoglio. "Laparoscopic management of superior mesenteric artery syndrome." *JSLS, Journal of the Society of Laparoendoscopic Surgeons* 7.2 (2003): 151-153, 151.  "The step-two inquiry is a de minimis screening device…If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met…. Reasonable doubts on severity are to be resolved in favor of the claimant." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 (3d Cir. 2003) (internal citations omitted).

The prior ALJ found that Plaintiff's SMA was a medically determinable, severe impairment. (Tr. 84). Here, the ALJ included physical limitations in the

RFC, suggesting more than minimal impact. (Tr. 26). The ALJ concluded Plaintiff could have "no more than occasional climbing, balancing and stooping with no climbing of ladders. The claimant must avoid vibration and hazards." (Tr. 26). Dr. Callahan limited Plaintiff to light work. (Tr. 383-86). As the Court *Markle* noted that "[e]ven absent the Commissioner's clarifying regulation, the severity of Markle's other impairments (obstructive pulmonary disease, hypertension, obesity and gout) which limit him to some forms of light work constitute impairments 'imposing additional and significant work-related limitations of function.'" *Markle*, 324 F.3d at 188.

Moreover, Plaintiff testified that, even in between surgeries, every time she ate her SMA caused such severe pain  that she would have to lie in the fetal position for up to an hour. (Tr. 51, 57, 184). She also asserted that her SMA had caused significant weight loss, which in turn led to a drop in blood pressure and dizziness upon standing. (Tr. 46). She asserted problems lifting and walking due to stomach pain.  (Tr. 180). If credited, these claims would establish that her SMA caused more than minimal work related function.

The ALJ relied on Plaintiff's activities of daily living, lack of treatment, and the medical evidence to find her less than fully credible. (Tr. 26-29). However, the ALJ mischaracterized Plaintiff's activities of daily living. The ALJ found that Plaintiff had "no restriction" in activities of daily living. (Tr. 25). The ALJ

explained that she could "prepare meals and perform household chores" and "shop in stores." (Tr. 25-26). This conclusion is unsupported by the record. Plaintiff reported that she could only cook microwaveable meals for less than ten minutes because she could not "stand long." (Tr. 177). She reported that she did not go out alone and could not count change. (Tr. 178). Plaintiff's mother reported that she cooks meals for Plaintiff, except for microwave meals, Plaintiff does not go anywhere by herself, and cannot handle money. (Tr. 189-91). Her mother indicated that Plaintiff could not walk, drive a car, or use transportation to get around, and is unable to go out alone. (Tr. 192). She reported that Plaintiff could not shop in stores without help. (Tr. 192). Her mother reported that the only household chores Plaintiff was "little bit of dusting" every other day for two hours, but only when told. (Tr. 191). Moreover, these activities are sporadic and transitory. *See Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001); *Smith v. Califano,* 637 F.2d 968, 971-72 (3d Cir. 1981). These activities do not negate Plaintiff's claim that she needs to lie down after eating or feels dizzy when standing. *Id.* Plaintiff's ability to hold a child for three minutes is not inconsistent with a more than minimal limitation in lifting and carrying. *Id.* Thus, the ALJ was not entitled to rely on Plaintiff's activities of daily living to find her less than fully credible.

The ALJ improperly relied on a lack of treatment for intellectual disability without considering whether there was any treatment for intellectual disability. (Tr.

27); SSR 96-7p ("[T]he adjudicator must not draw any inferences…from a failure to seek or pursue regular medical treatment without first considering any explanations…The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications…The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual").

The ALJ mischaracterized the record in concluding that there was minimal objective evidence. First, the ALJ never mentions Plaintiff's diagnosis of superior mesenteric artery ("SMA") syndrome. (Tr. 23-37). The ALJ mentions only Plaintiff's gastrojejunostomy, one of her three surgeries to address her SMA, and "gastroesophageal reflux disease." (Tr. 23). Moreover, the ALJ incorrectly and repeatedly notes that Plaintiff's surgery had "resolved" or "addressed" this condition. (Tr. 24, 27). Instead, Plaintiff's testimony and Dr. Gerhart's records indicate that she would likely continue to suffer symptoms and might need additional surgery in the future. (Tr. 431-32). Similarly, the ALJ wrote that Dr. Gerhart recommended only over-the counter medications after Plaintiff's surgery. (Tr. 24). However, Dr. Gerhart's records show that he recommended prescription

medications, but Plaintiff's insurance would not cover those prescriptions. (Tr. 431); *see also* SSR 96-7p. An ALJ may not mischaracterize the record. *See Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) ("Since the ALJ…misconstrued the evidence considered, his conclusion…must be reconsidered").

The ALJ also erred in assessing Plaintiff's dizziness. The ALJ wrote "there was no evidence of any established impairment that would cause this symptom." (Tr. 24). Plaintiff attributed her dizziness to low blood pressure. (Tr. 46). She indicated that this was exacerbated while standing. (Tr. 46). She explained her low blood pressure was caused by the weight loss from her gastrointestinal problems. (Tr. 46). Orthostatic hypotension is "[a] condition in which the blood pressure is low when the person is in an upright or standing position." 4-O Attorneys' Dictionary of Medicine O-86578. Medical records show blood pressure as low as 93/59. (Tr. 303). The ALJ does not mention Plaintiff's assertion that SMA related weight-loss caused low blood pressure, which caused dizziness. (Tr. 23-37, 46).

Defendant asserts that Plaintiff's SMA does not meet the duration requirement because the record shows she "reported increasing pain in August 2012, had the procedure in September 2012, and was eating solid food again in October 2012." (Def. Brief at 14) (citing Tr. 419-21, 431, 433)). However, Plaintiff's SMA had been present since 2009. (Tr. 291). Plaintiff's ability to eat a single plate of solid food in October of 2012 does not mean she did not continue to

suffer symptoms. (Tr. 431).  Dr. Gerhart opined that she would likely still suffer symptoms. (Tr. 434). Moreover, Plaintiff was not asymptomatic prior to August of 2012. In April of 2011, Dr. Gerhart diagnosed her with gastritis, and indicated that her abdominal pain was "likely due to gastritis" and an abdominal wall lipoma. (Tr. 427-29, 435). Dr. Gerhart prescribed Plaintiff Prevacid because she was suffering residual effects from her first two surgeries, but Plaintiff's insurance would not cover Prevacid. (Tr. 434). In February of 2012, Plaintiff exhibited "[d]iffuse abdominal tenderness." (Tr. 407).  She reported dizziness and low blood pressure through 2012. (Tr. 396, 399).

Plaintiff merely had to establish that her SMA provided more than minimal impact on her work-related function. The treatment record, which shows repeated failed surgeries, complications from surgery, recurrent gastritis, abdominal tenderness, and complaints of low blood pressure and dizziness, does not provide substantial evidence for the ALJ to conclude that her SMA caused only minimal limitations. The ALJ failed to provide any proper reason to reject Plaintiff's claims regarding her SMA. She reported limited activities of daily living, she treated her SMA with surgeries and lying in the fetal position, and her physician opined she would remain symptomatic. The only medical opinion in the record limited Plaintiff to light work. *Supra*.  The ALJ rejected Plaintiff's subjective claims for the "wrong reason." *Morales*, 225 F.3d at 317-18. Thus, the ALJ's determination

that Plaintiff's SMA was non-severe lacks substantial evidence. The Court recommends remand for the ALJ to properly assess Plaintiff's SMA.

### C.    Third-Parties

Plaintiff asserts that the ALJ erred in failing to make a credibility finding with respect to Plaintiff's mother and rejecting Plaintiff's aunt's credibility based solely on an unsupported inference that she had an interest in the outcome. (Pl. Brief at 12-15). As the Third Circuit explained in *Adorno v. Shalala*, 40 F.3d 43 (3d Cir. 1994:

> [T]he Secretary must "explicitly" weigh all relevant, probative and available evidence. *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir.1979); *see also Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986); *Cotter*, 642 F.2d at 705. The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Brewster*, 786 F.2d at 585. The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects. *Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir.1983)

*Id.* at 48. The Third Circuit specifically addressed third-party claims from family members in *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112 (3d Cir. 2000):

> Similar to the medical reports, the ALJ must also consider and weigh all of the non-medical evidence before him. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir.1983); *Cotter*, 642 F.2d at 707. Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, *see Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529), the ALJ must still explain why he is rejecting the testimony. *See Van Horn*, 717 F.2d at 873. In *Van Horn*, this Court set aside an ALJ's finding because he failed to explain why he rejected certain non-medical testimony. *See* 717 F.2d

at 873. In this case, the ALJ explained he rejected Burnett's testimony regarding the extent of her pain because he determined it was not supported by the objective medical evidence. However, the ALJ failed to mention the testimony of Burnett's husband, George Burnett, and her neighbor, Earl Sherman. On appeal, the Commissioner contends the ALJ did not need to mention their testimony because it "added nothing more than stating [Burnett's] testimony was truthful." Commissioner's Brief at 21. This argument lacks merit because the ALJ made a credibility determination regarding Burnett, and these witnesses were there to bolster her credibility. R. 17 ("claimant's allegations of disability made at hearing are unsubstantiated"). In *Van Horn,* we stated we expect the ALJ to address the testimony of such additional witnesses. On remand, the ALJ must address the testimony of George Burnett and Earl Sherman.

*Id.* at 122.

Defendant asserts that the ALJ did not need to address the claims of Plaintiff's mother. (Def. Brief at 16-18) (citing *Crosby v. Barnhart*, 98 Fed.Appx. 923 (3d Cir. 2004); *Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995); *Carnes v. Comm'r of Soc. Sec.*, 2008 WL 4810771, at *5 (W.D. Pa. Nov. 4, 2008); *Ford v. Barnhart*, 57 F. App'x 984, 988-89 (3d Cir. 2003); *Bailey v. Astrue*, Civ. No. 07–4595, 2009 WL 577455, at *11 (E.D. Pa. Mar. 4, 2009).

 Unlike *Burnett*, the cases cited by Defendant are not binding precedent on the Court. In contrast, *Burnett* plainly states that the Third Circuit "expect[s] the ALJ to address the testimony of such additional witnesses." *Id.* at 122; *see also Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504-05 (3d Cir. 2009); *Liszka v. Colvin*, CIV.A. 3:14-0280, 2015 WL 3771238, at *3-4 (M.D. Pa. June 17, 2015); *Frank–Digovanni v. Colvin,* 2014 WL 2177090 (M.D.Pa. May 22, 2014 *);*

*Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at \*12 (M.D. Pa. June 18, 2014).

Defendant asserts that *Burnett* is distinguishable from this case because here, the ALJ mentioned Plaintiff's mother's and Plaintiff's aunt's claims. (Def. Brief at 19). However, merely mentioning these claims is insufficient. The ALJ did not "provide some explanation for a rejection of probative evidence which would suggest a contrary disposition." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *see also Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (An ALJ may not reject evidence for "no reason"). The ALJ erred in failing to provide any reason to reject Plaintiff's mother's report.

An ALJ also may not reject probative evidence for the "wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000). The ALJ rejects Plaintiff's aunt's testimony solely because she allegedly had "an interest" in Plaintiff obtaining benefits. (Tr. 29). First, this allegation is unsupported. There is no evidence that Plaintiff's aunt lives with Plaintiff, provides Plaintiff with financial assistance, or would otherwise benefit from Plaintiff's receipt of benefits. Second, it is improper to reject a family member's claims solely because they have an interest in the claimant obtaining benefits:

> [E]very third party statement is submitted by individuals who know
> the claimant, and are often submitted by those who are closest to the
> claimant. *See,* 20 C.F.R. § 416.913 (other sources include "spouses,
> parents and other caregivers, siblings, other relatives, friends,

neighbors, and clergy."). If an ALJ could reject third [party] statements merely because that individual has some motivation to support the claimant's case, it would defeat the entire purpose of submitting third party statements and would run contrary to the Commissioner's express rulings. *See,* SSR 96–7p ("the adjudicator must consider the entire case record, including ... information provided by ... other persons.").

If an ALJ could reject third party statements as inherently unreliable for the reasons given, there would be no reason for a claimant to submit such statements. An ALJ could reject third party statements in every case by merely inserting boiler-plate language similar to the language used by the ALJ in this case.

*Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *12 (M.D. Pa. June 18, 2014).

Defendant asserts that this error was harmless. (Def. Brief). However, Plaintiff's aunt testified to her learning difficulties in school, which corroborates the severity of her learning disability. (Tr. 63-65). Plaintiff's mother reported a continuing inability to add, subtract, and count change, which corroborates the severity of her learning disability. (Tr. 186-96). Plaintiff's mother reported problems walking. (Tr. 186-96). Thus, the error was not harmless.

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.      The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.      The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: December 17, 2015                    _____s/Gerald B. Cohn_____
                                            GERALD B. COHN
                                            UNITED STATES MAGISTRATE JUDGE